543 So.2d 138 (1988)
CALHOUN COUNTY BOARD OF SUPERVISORS, et al.
v.
GRENADA BANK.
No. 56228.
Supreme Court of Mississippi.
July 20, 1988.
As Modified on Denial of Rehearing May 3, 1989.
*140 Cliff R. Easley, Jr., Yancy, Easley & Cooper, Bruce, for appellants.
Edwin Tharp Cofer, Grenada, for appellee.
Before ROY NOBLE LEE, C.J., and ROBERTSON and SULLIVAN, JJ.
ROY NOBLE LEE, Chief Justice, for the Court:
Appellee Grenada Bank is a Mississippi banking corporation and, at the time of this suit, was operating branch banks in fifteen Mississippi counties. Two of these branch banks, Calhoun County Bank and Bank of Derma, are located in Calhoun County.
On January 21, 1983, appellee reported to the Calhoun County tax assessor that the net value of the intangible assets of its two Calhoun County branches was $23,991. Quite to the contrary, the Calhoun County tax assessor computed the value of these intangibles to be $522,561 and assessed them for taxation at 100% of this amount. Based upon a levy of 95.5 mills, and adding an assessment $8,635 for furniture and fixtures, appellee was thus charged taxes of $50,729.22, over twice what it contended was the true value of its branch banks' intangibles.
Appellee made timely objection to this valuation and assessment, and the Calhoun County Board of Supervisors overruled the objection. Appellee paid the taxes under protest and perfected an appeal to the Circuit Court of Calhoun County, where a jury trial was had. The jury found the valuation made by the county tax assessor to be fair and reasonable. Upon appellee's motion, the trial court entered judgment for appellee notwithstanding the verdict. In setting aside the jury verdict, the court reasoned that the tax assessor's valuation and assessment were unconstitutional under § 112 of the State Constitution, which requires that the imposition of taxes be equal and uniform throughout the state. The court found violation of § 112 because the formula for valuation used for assessment by Calhoun County was different from the formula employed by the other fourteen counties in which appellee maintained branches. The court also found violation of § 112 in that appellee's branches were assessed at 100% of true value while the personal property of other taxpayers in Calhoun County was assessed at only 30%. (Real property was assessed at 15%.) Based upon the formula used in the other counties, the trial court held that the value of appellee's intangibles in Calhoun County was $23,991, to be assessed at a rate of 22.269%[1] on a levy of 95.5 mills, thus yielding a tax liability for appellee of $510.21, nearly 99% less than the tax paid by appellee under protest. Accordingly, the trial court ordered a refund of the excess.
From this judgment the Calhoun County Board of Supervisors now perfects its appeal, and appellee cross-appeals.
ISSUES
I.
HOW IS THE VALUE OF BRANCH BANKS' INTANGIBLE PROPERTY TO BE DETERMINED FOR TAX PURPOSES?
II.
TO WHAT EXTENT MAY THE EARNED SURPLUS OF THE PARENT BANK AND ALL ITS BRANCHES BE EXCLUDED FROM CALCULATION OF THE VALUATION CONSTANT USED *141 IN DETERMINING THE BRANCHES' INTANGIBLE VALUE?
III.
TO WHAT EXTENT MAY THE BAD DEBT RESERVES AND ALLOWANCES OF THE PARENT BANK AND ALL ITS BRANCHES BE EXCLUDED FROM CALCULATION OF THE VALUATION CONSTANT USED IN DETERMINING THE BRANCHES' INTANGIBLE VALUE?
IV.
WHAT IS THE PROPER ASSESSMENT RATIO FOR USE IN TAXATION OF BRANCH BANKS?

DISCUSSION

I.

HOW IS THE VALUE OF BRANCH BANKS' INTANGIBLE PROPERTY TO BE DETERMINED FOR TAX PURPOSES?
There is no specific statutory guidance for evaluating the intangible assets of branch banks. Miss. Code Ann. § 27-35-37 (1972) directs the manner of assessment of such intangibles:
At the time fixed by law for the assessment of banks, the person in charge of a branch bank shall furnish the assessor, under oath, a statement showing the amount of the capital of the parent bank employed by it, less that invested in real estate of the said branch bank, and the assessor shall assess it accordingly. The said real estate shall be assessed where situated as other real estate. The branch bank shall pay taxes, state, county and municipal, upon such assessment in the county where located, at the time and in the manner that banks are required by law to pay taxes. This shall not apply to agents who do not sell exchange, but simply make collections. The amount of capital so assessed against the branch bank shall be credited on the assessment of capital of the parent bank.
Nothing in the foregoing section pertains to valuation. Miss. Code Ann. § 27-35-29 (1972) deals generally with valuation of property subject to ad valorem taxes. That section provides in pertinent part:
It shall be the duty of each person fixing the value of his property to estimate the same at its cash value at the time of valuation, and not what it might sell for at a forced sale, but what he would be willing and would expect to accept for it if he were disposed to sell it.
(Emphasis added.)
This value is generally referred to as "true value." Miss. Const. § 112, as amended; Washington County Bd. of Supervisors v. Greenville Mill, 437 So.2d 401 (Miss. 1983); State Tax Commission v. Fondren, 387 So.2d 712 (Miss. 1980).
The intangible value of a unitary banking system, i.e., of a parent bank and all its branches viewed as one, can be determined simply enough. The difficulty lies in apportioning this value among the parent and its branches viewed separately. Where, as in the case sub judice, the parent and its branches are located in several counties, the intangible value of the entire system has no single situs, for intangible value by definition is an incorporeal asset. There must therefore be some device by which this intangible value is distributed among all the taxing districts occupied by the banking system. In this case, appellant relied on one valuation formula for meeting this need, and appellee relied on another.

A. Tax Commission Formula

In May, 1981, the State Tax Commission suggested a formula for evaluation of branch bank intangibles. This formula was printed on the Commission's Form 71-070, "Assessment of Intangibles of Branch Banks," and was clearly labeled as a suggestion only:
NOTE: The Tax Commission suggests that the capital assigned to branch banks be determined by applying the ratio that Book Value of real and personal property assessed to the branch bank bears to the Book Value of real and personal *142 property owned by the bank and its branch banks, to the Net Value for Assessment Purposes computed on Form 71-068.
This formula may be expressed algebraically as follows:

 LBP X PC = VI
 ___
 AP

LBP is local branch property, i.e., the value of the property of the branch bank(s) located in the assessing county. AP is all property, i.e., the value of all the property of the parent bank and all its branches regardless of location. PC is parent bank's capital, i.e., the assessed capital of the parent bank and all its branches as determined from Tax Commission Form 71-068.[2] VI is value of intangibles.
Operation of this formula is simple. The property fraction yields a percentage. The PC figure is then multiplied by this percentage to yield figure VI which represents that portion of the intangible value of the banking system allocated to the assessing county. In the case at bar, the value of the property of appellee's Calhoun County branches was $212,857. The value of the property of the parent bank (appellee) and all its branches was $9,736,596. Under the formula, this yields a percentage of 2.19%. Figure PC, the parent's assessed capital, was $10,814,957. Multiplied by 2.19%, this yields a VI of $236,848. From this figure VI there is then subtracted for assessment purposes the value of the real estate held by the local branches and the value of the branches' tangible personalty, as these are taxed separately. See Miss. Code Ann. § 27-35-11, § 27-35-12. Combined, these subtracted amounts equal figure LBP. Thus, in this case, VI minus LBP equals $23,991, the value of appellee's Calhoun County Branch intangibles for purposes of assessment.

B. Calhoun County Formula

In the case at bar, the Calhoun County Tax Assessor employed an evaluation formula different from that suggested by the State Tax Commission. The Tax Assessor's formula was based upon deposits received rather than property held:

 LBD X PC = VI
 ___
 AD

LBD is local branch deposits, i.e., the value of all deposits made to the branch banks in the assessing county. AD is all deposits, i.e., the value of all deposits made to the parent bank and all its branches regardless of location. As with the Commission's suggested formula, PC is parent bank's assessed capital, and VI is value of intangibles.
Deposits made to appellee's Calhoun County branches during the period in question totalled $30,909,000. Combined deposits made to the parent bank (appellee) and all its branches totalled $452,824,747. Under the Tax Assessor's formula, this yields a percentage of 6.83%. In the case at bar, the Tax Assessor used a percentage of 6.8%. Figure PC multiplied by 6.8% yields a VI of $735,417. As with the Commission formula, there is subtracted from this figure VI an amount equal to the Commission formula LBP. Thus, in this case, under the Calhoun County Tax Assessor's formula, VI minus LBP equals $522,560, the value of appellee's Calhoun County bank intangibles for purposes of assessment.[3]

C. Analysis

It should be apparent from comparison of these two formulas that the parent bank and all its branches, when viewed as a whole, receive the same valuation under either formula. If the same formula is used for the parent and all its branches, then the adding together of every separate figure VI reached will equal figure PC. Since figure PC is the same in both formulas, the overall valuation reached under either formula is the same.
What differs between the two formulas is the result in apportioning the overall *143 valuation among the parent and all its branches. Under the Calhoun County formula, the valuation of appellee's Calhoun County branches is nearly 22 times greater than under the Tax Commission formula. However, the result is that if the Calhoun County formula is applied to appellee and its remaining branches elsewhere, valuation of some other branch or branches will necessarily be correspondingly lower than would have been the case under the Tax Commission formula. Again, this is because overall evaluation (figure PC) is the same under either formula. But notwithstanding this fact, the overall tax liability of appellee and all its branches, when viewed as a whole, may be substantially greater under the Calhoun County formula because the effect of the formula may be to transfer a substantial amount of value to the Calhoun County branches from branches in other counties with lower millage rates.
The competing interests between the parties make clear the reason for the dispute over which formula to use. Each taxing county is vitally interested in employing the formula which determines it as the situs for the greatest possible portion of a bank's intangible value. Taxpayers such as appellee are equally interested in minimizing their tax liability by having as much of this intangible value as possible situated in counties with the lowest millage rates. The question is, therefore, how can the overall capital of the parent bank and all its branches be most equitably apportioned among the branches for valuation for tax purposes?
The first major consideration in determining equitable apportionment of intangible value is selecting a valuation constant which will represent the entire intangible value of the parent bank and all its branches, e.g., figure PC in the two formulas discussed above. We think both the State Tax Commission formula and the Calhoun County Tax Assessor's formula are questionable in this respect. Figure PC, which is the valuation constant in both formulas, represents the total value of the parent's and all branches' stated capital and undivided profits. However, it is apparent from Tax Commission Form 71-068 that the Commission considers the value of the parent's and branches' real and personal property to be included in this figure PC. Indeed, appellee's Form 71-068 for the period in question indicates that real and personal property constituted 97% of figure PC.[4] Since this real and personal property is excluded from the tax imposed by § 27-35-37 and is instead taxed separately (§ 27-35-11, § 27-35-12), it is unclear why a formula to determine the assessed value for such a tax would base its valuation almost entirely on assets exempt from the tax on intangibles.
It appears to us that the valuation constant should logically be figure PC less the value of the parent's and all its branches' real and personal property. Such a figure could be calculated with a reasonable amount of certainty. The valuation constant, or VC, could be expressed algebraically as follows:

 (SC + UP) - AP = VC

SC is stated capital of the parent and all its branches. UP is undivided profits of the parent and all its branches. Each of these figures is ascertained from the combined balance sheet of the parent and all its branches. AP is all property, i.e., the value of all real and personal property owned by the parent and all its branches. This figure is reported to county and city assessors on State Tax Commission Form 71-069.
Applied to appellee, this suggested approach would yield a valuation constant of $1,078,361:

 $ 6,702,980 (SC)
 + 4,111,977 (UP)
 ___________
 10,814,957
 - 9,736,596 (AP)
 ___________
 1,078,361 (VC)

The second major consideration in determining equitable apportionment of intangible value is selecting the basis of the *144 ratio by which each branch's share of the valuation constant will be computed. The Tax Commission's formula bases this ratio on the amount of real property and personal property owned by a branch as opposed to that of the parent and all its branches. Appellee's Calhoun County branches account for 2.19% of all the real and personal property of appellee and all its branches; thus, under the Tax Commission formula, the intangible value of the Calhoun County branches is assessed at 2.19% of the valuation constant (figure PC), or $236,848.
On the other hand, the Calhoun County Tax Assessor's formula bases its ratio on the amount of deposits received by a branch as opposed to the amount received by the parent and all its branches. Appellee's Calhoun County branches account for 6.83% of all the deposits made to appellee and all its branches; thus, under the Calhoun County formula, the intangible value of the Calhoun County branches is assessed as 6.83% of the valuation constant (figure PC), or $735,417.
The ratio employed is necessarily somewhat of an arbitrary factor because it is being employed to allocate intangible value of a multicounty banking corporation viewed as a single unitary business with its intangible value having no true situs or location. The basis of the ratio might be any number of factors: property owned, deposits received, notes or mortgages held, or perhaps a combination of any of these. But the prime consideration in selecting a basis for the ratio is to arrive at a figure which fairly, reasonably and realistically represents a branch's relative worth to the parent bank and all its branches as a whole, i.e., its true value. See Miss. Const. § 112, as amended.
We fail to see how a ratio based solely upon real and personal property owned by a branch can serve as an accurate indicator of its relative value to the parent and its branches. A branch bank's value to its parent is not in the worth of the branch's building or lot or equipment, but, rather, in the amount of business it generates. Deposits received and notes and mortgages held are far more indicative of a branch's business productivity than is the value of the building out of which it operates.
For this reason, we agree with appellant that the Calhoun County Tax Assessor's approach in using deposits as the basis for the ratio is more reasonable than the property basis suggested by the State Tax Commission.

D. Legislative Intent

Although we are persuaded by the Calhoun County formula, we have no authority to require the use of it or any other valuation formula absent some indication of how the legislature intends branch banks to be valued for purposes of taxation. We recently acknowledged that
questions of accounting theory have no proper part in our decision, except that such theory has been incorporated into our law. There is no natural law of tax liability. No brooding omnipresence or invisible hand informs our consideration of such cases. The amount of tax a taxpayer owes to this state is determinable solely by reference to the positive provisions of the tax laws of this state and the regulations of the State Tax Commission promulgated within the scope of its authority.
Mississippi State Tax Comm'n v. Dyer Investment Co., Inc., 507 So.2d 1287, 1290 (Miss. 1987) (footnote omitted). As the Tax Commission formula is not a regulation but only a suggestion, the positive provisions of our tax laws must govern the disposition of this issue.
It is a well-settled principle of statutory construction that all statutes dealing with the same or similar subject matter must be read in pari materia, with each statute given *145 effect to the extent possible, so that the intent of the legislature may be ascertained. Allgood v. Bradford, 473 So.2d 402 (Miss. 1985); Miss. Public Service Comm'n v. Municipal Energy Agency of Mississippi, 463 So.2d 1056 (Miss. 1985); Andrews v. Waste Control, Inc., 409 So.2d 707 (Miss. 1982); Lamar County School Board v. Saul, 359 So.2d 350 (Miss. 1978). For insight as to how the legislature intends the intangible property of branch banks to be valued, we look to Miss. Code Ann. § 27-13-13 (Supp. 1987), which prescribes a formula for the valuation of local offices of multistate corporations:
In the case of organizations doing business both within and without Mississippi, the value of the capital employed in this state shall be determined by first computing the ratio between (1) the real and tangible personal property owned in Mississippi and gross receipts from business carried on in Mississippi, and (2) the total real and tangible personal property owned and gross receipts wherever located and from wherever received. Said ratio then shall be applied to the total capital stock, surplus, undivided profits and true reserves and the result of that application shall be the capital employed in this state.
This valuation formula may be expressed algebraically as follows:

 (LP + LR) X TC = VI
 _________
 (AP + AR)

LP is local property, i.e., the value of the corporation's property located in Mississippi. LR is local receipts, i.e., the value of the corporation's gross receipts derived from business transacted in Mississippi. AP is all property, i.e., the value of all the property of the corporation regardless of location. AR is all receipts, i.e., the value of all gross receipts of the corporation regardless of origin. TC, the valuation constant, is total capital of the corporation. VI is value of intangibles.
Although this formula's ratio is based in part upon the value of property held by the local office, the formula also bases its ratio on the relative value of local business as measured by local gross receipts, which, like bank deposits received, is a far more reliable indicator of the worth of the local office to its parent corporation than property value alone.
Section 27-13-13 is particularly well-suited for application to this case because the problems encountered in valuing the assets of a multistate corporation's Mississippi assets are directly analogous to those faced in valuing the intangible assets of branch banks, which are essentially parts of multicounty corporations. Further, the multistate corporation formula is more persuasive authority for valuation of branch banks since it represents a legislative mandate for resolution of a virtually identical problem, while the Tax Commission formula is merely a suggested approach of a state agency.
The multistate corporation formula is easily adapted to branch bank valuation in the following terms:

 (LBP + LBD) X VC = VI
 ___________
 (AP + AD)

LBP is local branch property, i.e., the value of the property of the branch bank(s) located in the assessing county. LBD is local branch deposits, i.e., the value of all deposits made to the branch bank(s) in the assessing county. AP is all property, i.e., the value of all the property of the parent bank and all its branches regardless of location. AD is all deposits, i.e., the value of all deposits made to the parent bank and all its branches regardless of location. VC is the valuation constant, excluding the value of the parent's and branches' real and personal property, as formulated earlier in this discussion.[5] VI is value of intangibles. Applied to appellee, the adapted multistate corporation formula works as follows:

 (212,857 + 30,909,000) X $1,078,361 = 72,574
 __________________________
 (9,736,596 + 452,824,747)

*146 The ratio yielded by this formula is 6.73%. This ratio, applied to figure VC, yields an intangible value of $72,574. It must be remembered that under this adapted multistate corporation formula, there is no deduction of the value of the branches' real and personal property from figure VI, because these values are excluded from the formula at the outset, unlike the formulas suggested by the Tax Commission and Calhoun County.
The final valuations reached under the three formulas discussed above are as follows:

 Tax Commission Formula $ 23,991
 Calhoun County Formula 522,560
 Adapted Multistate Corporation
 Formula 72,574

If these amounts are assessed and levied upon as directed by the court below (22.269% at 95.5 mills), the following tax liability results for appellee:

 Tax Commission Formula $ 510.21
 Calhoun County Formula 11,113.23
 Adapted Multistate Corporation
 Formula 1,543.42

E. Applicable Law

The reason why it is especially important to employ the valuation formula which most fairly, reasonably, and realistically represents the branches' relative worth is because the same formula must be applied to all branches statewide. Section 112 of the Mississippi Constitution requires that "[t]axation shall be uniform and equal throughout the state."[6] This mandate takes precedence even over the principle that assessment must be made on true value, for if there is no uniformity of evaluation of those taxed, then the result is that the taxpayer is deprived of the very protection guaranteed by § 112.
Further, under certain circumstances, lack of uniformity in valuation may lead to double taxation. In fact, double taxation would occur in the case at bar if Calhoun County were allowed to use its own valuation formula. All of the other counties in which appellee maintains branches use the Tax Commission formula. If appellee's Calhoun County branches are valued at 2.19% of the total intangible value according to the Commission formula, then appellee and all its branches share among themselves 100% of the total intangibles valuation. But if the Calhoun County formula is used so that the local branches are valued at 6.8% of total intangible value while the Tax Commission formula is used in all other counties, then the result is that appellee and all its branches share among themselves 104.61% of the total intangibles valuation: the effect is that nearly 5% of the intangible assets of appellee and its branches are taxed twice. See Craig v. Dun & Bradstreet, 202 Miss. 207, 30 So.2d 798 (1947); Thompson v. Craig, 196 Miss. 465, 17 So.2d 439 (1944); Panola County v. C.M. Carrier & Sons, 92 Miss. 148, 45 So. 426 (1908). Additionally, it is evident that mixed use of the two formulas would result in taxation of the entire value of all the intangibles of appellee and its branches at an amount in excess of true value. Such would also be a violation of § 112. Stuart v. Board of Supervisors of Scott County, 195 Miss. 1, 11 So.2d 212 (1943).
The formula sought to be employed by the Calhoun County Tax Assessor must fail because it (1) destroys uniformity of valuation, (2) creates a partial double tax, and (3) results in valuation of the entire intangible assets of appellee and all its branches at greater than true value. Without *147 question, these objections would be cured if the Calhoun County formula were used in every county in which appellee maintains branches. However, the facts in this case are otherwise.
It is apparent that we must sustain the use of the Tax Commission formula in the case at bar, notwithstanding that use of the adapted multistate corporation formula more closely adheres to the intent of the legislature. The latter formula cannot be applied to appellee retroactively because such application would create a retroactive partial double tax, as explained above. The only alternative to use of the Tax Commission formula under these facts, considering the equality and uniformity provisions of Miss. Const. § 112, would be to require retroactive revaluation under the adapted multistate corporation formula and reassessment of every branch bank in Mississippi for each tax year dating back to 1982. We decline to impose such an administrative burden on the banks and counties of this state.
The trial court reached the right result in assessing the intangibles of appellee's Calhoun County branches according to the State Tax Commission formula. However, in view of the overriding constitutional consideration of equality and uniformity in the application of tax laws, and in view of our duty to construe statutes in accordance with the perceived intent of the legislature, we now prospectively require use of the adapted multistate corporation formula as discussed herein for valuation of branch banks until such time as the legislature may provide otherwise.

II.

TO WHAT EXTENT MAY THE EARNED SURPLUS OF THE PARENT BANK AND ALL ITS BRANCHES BE EXCLUDED FROM CALCULATION OF THE VALUATION CONSTANT USED IN DETERMINING THE BRANCHES' INTANGIBLE VALUE?
It will be recalled from the foregoing discussion that the valuation constant is that figure to which the ratio or percentage is applied to determine the intangible value of the parent's branches. Under the State Tax Commission and Calhoun County formulas, the valuation constant is the assessed capital of the parent bank and all its branches as determined from Tax Commission Form 71-068. Under the adapted multistate corporation formula, the valuation constant is the stated capital and undivided profits of the parent and all its branches, excluding the value of all real and personal property owned by the parent and all its branches. The purpose of the valuation constant in each of these three formulas is to approximate, for purposes of the § 27-35-37 intangibles tax, the net worth of the parent and all its branches.
That portion of the capital of the parent and its branches carried on the combined balance sheet as "earned surplus" is excluded from the valuation constant pursuant to Miss. Code Ann. § 27-35-35 (Supp. 1982), which provides in pertinent part:
From the net worth of the bank thus determined, there shall be deducted the amount of capital invested in real estate owned by the bank, as shown by its books, the par value of preferred stock and debentures owned by the reconstruction finance corporation or other similar government agencies, and "earned surplus" to the extent authorized by section 81-3-11, Mississippi Code of 1972, and the remainder shall be the basis of the assessment of the intangibles of the bank or of the capital or the owner thereof in case the bank be not a corporation or joint stock company.
(Emphasis added.) Miss. Code Ann. § 81-3-11 (1972) governs the amount of capital reserves required for banks. That section provides in pertinent part:

*148 (2) For the purpose of strengthening its capital structure, every banking corporation organized under the laws of this state shall, except as otherwise provided herein, at the close of business each year set aside to the credit of a separate surplus account, to be denominated on its books "Earned Surplus," an amount not less than twenty-five per cent (25%) of its net earnings, after providing for the payment of dividends on its preferred stock, if any, until equal to three (3) times the total of its common and preferred stock. However, any bank having at the close of the business year a ratio of total deposits to total capital, surplus and earned surplus not in excess of a ratio of ten dollars ($10.00) of deposits to one dollar ($1.00) of total capital (such deposits to be the average of the deposits shown by all of the calls for the business year and such capital to include all stock, surplus and earned surplus) shall be required to set aside twenty-five per cent (25%) of its earnings only to the extent necessary to cause its "Earned Surplus" account to equal its total capital. When such ratio of total deposits to total capital of any bank at the close of business of any year does not exceed that specified above and the "Earned Surplus" account is equal to or more than the amount of its total capital, then such bank shall not be required to set aside twenty-five per cent (25%) of its earnings for that year to the credit of its "Earned Surplus" account, but may so set aside any part of its earnings until its "Earned Surplus" account is equal to three (3) times its total capital. The net earnings of every bank set aside to its "Earned Surplus" account shall be exempt from all state, county, municipal, levee district and other ad valorem taxes.
(Emphasis added.)
Because § 27-35-35 provides for deduction of earned surplus "to the extent" authorized by § 81-3-11, and because § 81-3-11 authorizes reservation of earned surplus "until" the reservation equals three times the total capital, appellant insists that reservation is limited to a maximum of three times the capital. In the case at bar, appellee's preferred and common stock capital was $6,702,980, and its earned surplus reserves totalled $35,897,020, i.e., nearly five and one-half times the capital. If appellant's construction of the statutes is accepted, then the maximum amount appellee could carry as earned surplus would be $20,108,940. Thus, an additional $15,788,080 in capital would be subject to taxation, and the amount of appellee's taxable capital would be increased by some 46%. Appellee counters that these statutory provisions do not prescribe a maximum amount attributable to earned surplus but instead that an amount three times the capital is the minimum which must be reserved under § 81-3-11.
When the predecessor of § 81-3-11 was enacted in 1934, there was no question as to the amount of earned surplus which was exempt from taxes. The original statute provided that "[t]he earnings of every bank required to be set aside to surplus under the provisions of this section shall be exempt from all state, county, municipal, levee district and other ad valorem taxes, up to an amount not exceeding one hundred per cent of its capital as herein defined." Miss. Laws 1934, ch. 146, § 7(b) (emphasis added). (The statute required a reservation of one hundred percent of capital as opposed to the three hundred percent requirement of § 81-3-11.) This clause limiting tax exemption was deleted from the statute in 1944, and each subsequent amendment, up to and including the present version of the statute, is silent regarding the limit of tax exemption for capital designated as earned surplus. Miss. Laws 1944, ch. 254; Miss. Laws 1948, ch. 204; Miss. Laws 1966, ch. 241; Miss. Laws 1968, ch. 256; Miss. Code Ann. § 81-3-11 (1972).
Section 27-35-35 authorizes deduction from taxable capital that amount of earned surplus "to the extent authorized by" § 81-3-11. The first such "to the extent" *149 cross-reference is found in Miss. Laws 1944, ch. 259, where exclusion is allowed "to the extent authorized by section 7-b, chapter 146, laws of 1934, as amended... ." But the same 1944 Legislature amended Miss. Laws 1934, ch. 146, § 7(b) so that the specific exclusion previously recited ("an amount not exceeding one hundred per cent of its capital") was deleted.
In accordance with the stated purpose of strengthening the capital structure of banking institutions, § 81-3-11 requires all banking corporations to maintain a fixed minimum amount in an "earned surplus" account. The section requires generally that every bank set aside an amount equal to 25% of its net earnings in this earned surplus account until the earned surplus account is equal to three times the total value of common and preferred stock. However, for banks which have a ratio of deposits to total capital, surplus and earned surplus which does not exceed $10.00 of deposits to $1.00 of total capital, the requirement is that the bank set aside 25% of its earnings only to the extent necessary to cause the "earned surplus" to equal its total capital.
Where the ratio of deposits to capital does not exceed $10.00 deposits to $1.00 in capital and where the "earned surplus" is equal to or greater than the total capital, the bank is not required to set aside the 25% to the credit of "earned surplus." In the latter instance the statute provides that the bank is not required to set aside any funds to "earned surplus," "but may so set aside any part of its earnings until its `Earned Surplus' account is equal to three (3) times its total capital." Miss. Code Ann. § 81-3-11(2) (1972).
The legislative intent appears clear. Generally, a bank is required to build and carry an "earned surplus" account in an amount which is three times the value of its issued stock. (3:1) Under certain conditions, this requirement is reduced so that the bank only has to build and carry an "earned surplus" account which is equal to the value of its issued stock (1:1), but may build and carry an earned surplus of an amount three times the value of its issued stock (3:1). In the latter case, the 3 to 1 ratio appears to definitely create an upper limit on the amount which can be carried as "earned surplus" or at least to limit the amount of earned surplus which can be deducted from taxes due under Mississippi Code Annotated § 27-35-35 (1972). That section provides that when calculating its net worth for the purpose of paying ad valorem taxes, the bank may deduct from net worth the "earned surplus" to the extent authorized by section 81-3-11 (1972). Section 27-35-35 appears to be clear that "earned surplus" is not deductible in any amount which the bank may choose but is deductible only to an extent specified in § 81-3-11. Taken together with the language of § 27-35-35, the language of § 81-3-11 provides a clear upper limit on the amount of "earned surplus" which may be deducted from net worth for ad valorem tax purposes.
We are of the opinion that from a policy standpoint, the legislature logically and reasonably, probably wished to provide a tax break only to the extent of the requirements it makes of banks for strong and safe operations.

III.

TO WHAT EXTENT MAY THE BAD DEBT RESERVES AND ALLOWANCES OF THE PARENT BANK AND ALL ITS BRANCHES BE EXCLUDED FROM CALCULATION OF THE VALUATION CONSTANT USED IN DETERMINING THE BRANCHES' INTANGIBLE VALUE?
Appellee excluded from its taxable capital the sum of $2,048,223 which was carried on its books as "Allowance for *150 Loan Losses." The lower court held that this exclusion was proper. Appellant contends that there is no statutory authority for such exclusion and that bad debt reserves should be included in the taxable capital.
Section 27-35-35 provides that the net worth (i.e., valuation constant) of a bank is determined by adding its capital and "reserves or accumulations of any sort" and then deducting certain named liabilities and "other similar items, constituting a debt against the reserves of the bank." Appellee argues that bad debt reserves are such "other similar items" contemplated by the statute as deductible from net worth. This argument, accepted by the trial court, is based upon analogy to Miss. Code Ann. § 27-13-9 (Supp. 1982) which sets forth the valuation formula for computing corporation franchise tax. That formula expressly excludes "bad debt reserves" from valuation. Appellee's theory is that because § 27-35-35 provides that special bank taxes be credited against the bank's corporation franchise tax liability, the purpose of special bank taxes such as the tax on branch banks is the same as the corporation franchise tax. Therefore, appellee reasons, deductions allowed under the franchise tax should also be allowed under the bank tax.
We disagree. Section 27-35-35 specifically states that capital, prior to allowed deductions, shall include "reserves or accumulations of any sort." This would certainly encompass bad debt reserves. Deductions authorized under § 27-35-35 are:
(1) due and unpaid taxes;
(2) declared and unpaid dividends;
(3) actual depreciation of personal property not entered on books; and
(4) other similar items constituting debts against the reserves of the bank.
All of these deductions represent actual, realized debts chargeable against the assets of the bank. But bad debt reserves, on the other hand, are not true debts but are contingency allocations for debts which may be realized, i.e., actually become worthless, at a later date. See I.R.C. § 166 (1988). See also Roth Steel Tube Co. v. Commissioner of Internal Revenue, 620 F.2d 1176 (6th Cir.1980); Loewi v. Commissioner of Internal Revenue, 232 F.2d 621 (7th Cir.1956); Milton Bradley Co. v. U.S., 146 F.2d 541 (1st Cir.1944); Hamlen v. Welch, 116 F.2d 413 (1st Cir.1940). Because bad debt reserves do not represent realized debts chargeable against the assets of the bank, we conclude that such reserves and allocations are not "other similar items constituting debts" entitled to deduction under § 27-35-35.
Under federal tax law, a bank is not entitled to deduct the entire balance of its bad debt reserve but rather only that reasonable addition made to the reserve to reimburse the fund for actual bad debts covered during the taxable year. I.R.C. § 585 (1988); 1988 Fed.Tax Reg. § 1.585-1. This concept is consistent with our interpretation of § 27-35-35 suggested above. Additions made to the reserve to replenish the fund for bad debts actually covered would represent realized debts chargeable against the assets of the bank and would therefore be deductible under § 27-35-35 as "other such items."
Therefore, the trial court erred in holding that the entire balance of appellee's bad debt reserves was deductible. The clear intention of § 27-35-35 is to allow deduction of realized debts chargeable against the assets of the bank. Accordingly, only those disbursements from appellee's bad debt reserve made to cover actual bad debts realized during the taxable year are deductible; the remaining balance is merely a contingency reserve not representing actual debts chargeable against assets.

IV.

WHAT IS THE PROPER ASSESSMENT RATIO FOR USE IN TAXATION OF BRANCH BANKS?
The assessment ratio is that percentage of true value upon which tax is imposed. Miss. Const. § 112, as amended. Appellant attempted to employ an assessment ratio of 100% in computing the tax liability of appellee's Calhoun County branches. The trial court held this assessment to be unconstitutional and, for reasons discussed infra, substituted an assessment ratio of 22.269%.
Section 112 of the Constitution states that "the legislature may provide for a special mode of valuation and assessment for railroads, and railroad and other corporate property... ." Section 181 provides in pertinent part:
The property of all private corporations for pecuniary gain shall be taxed in the same way and to the same extent as the property of individuals, but the legislature may provide for the taxation of banks and banking capital, by taxing the shares according to the value thereof (augmented by the accumulations, surplus, and unpaid dividends), exclusive of *151 real estate, which shall be taxed as other real estate.
Obviously, the intangible assets of a branch bank are personal property. Therefore, unless the legislature has provided otherwise, § 181 requires that a bank's personalty "be taxed in the same way and to the same extent as the property of individuals." Appellant cites no statute, and we have found none, which provides that the property of banks or corporations in general shall be assessed at a ratio greater than that of other property. Accordingly, § 181 of the Constitution requires that the intangible property of appellee's Calhoun County branches be assessed at the same ratio employed for all other personal property taxed in Calhoun County.
The trial court's assessment ratio of 22.269% was determined by application of a formula endorsed by this Court in Washington County Board of Supervisors v. Greenville Mill, 437 So.2d 401 (Miss. 1983). There, the county had imposed separate and different assessment ratios for personal and real property. This Court held that practice to be violative of Miss. Const. § 112. To arrive at a substitute ratio, the Court divided the assessed value[7] of all taxable property in the county by the true value of all the taxable property. This formula was followed by the trial court in the case at bar. The assessed value of all taxable property in Calhoun County was $27,779,183, and the true value of the same property was $124,172,842. When the former is divided by the latter, the resulting percentage is 22.269%.
Appellant bases much of its argument under this assignment upon Magnolia Bank v. Board of Supervisors of Pike County, 111 Miss. 857, 72 So. 697 (1916). That case states precisely the opposite of our holding here and sanctions the assessment of banks at a ratio of 100% while all other property is assessed at a lesser ratio. The rationale of the decision appears to be that where the Constitution contemplates assessment at true value and some property in the district is assessed at less than true value, he whose property is assessed at true value cannot complain that his property too should have been "illegally" assessed at a lower rate. See, e.g., Southern Railway Co. v. Commissioner, 211 Va. 210, 176 S.E.2d 578 (1970). This rationale has been rejected by several jurisdictions. See 3 A.L.R. 1370, 28 A.L.R. 983, 55 A.L.R. 503 and cases collected therein; Merlino v. Tax Assessors for Town of North Providence, 114 R.I. 630, 337 A.2d 796 (1975); Anderson's Red & White Store v. Kootenai County, 70 Idaho 260, 215 P.2d 815 (1950).
The overriding Constitutional consideration is not that property be assessed at true value, but rather that taxation be equal and uniform throughout the state. Absent a legislatively-created "special mode" of assessment for banks providing otherwise, we interpret the guarantees of equal and uniform assessment conferred by §§ 112 and 181 to extend to banks just as to all other taxpayers. The result reached in Magnolia Bank is at odds with these guarantees. As there is no statute authorizing the assessment of bank intangibles at a rate greater than other personal property in general, §§ 112 and 181 protect such bank property from disproportionate assessment. We therefore find appellant's reliance upon Magnolia Bank v. Board of Supervisors of Pike County, supra, unpersuasive.
The trial court correctly held that the proper assessment ratio was 22.269%.[8]

*152 ON CROSS-APPEAL
Appellee first argues on cross-appeal that the Calhoun County Bank and the Bank of Derma are not truly branches of appellee and that, therefore, the § 27-35-37 tax on intangibles is inapplicable to them. As authority for this contention, appellee cites Lambert v. Mississippi Limestone, 405 So.2d 131 (Miss. 1981), which holds that "tax laws are to be strictly construed against the taxing powers and all doubt resolved in favor of the taxpayer." 405 So.2d at 132. But what is lacking in appellee's contention is any reason why there should be doubt as to the status of the Calhoun County Bank and the Bank of Derma as branches of appellee. As appellee makes no attempt to explain, either through argument or by citation to authority, why these banks are not branches within the meaning of § 27-35-37, we do not consider this contention on appeal. Haygood v. First National Bank of New Albany, 517 So.2d 553 (Miss. 1987); Bonderer v. Robinson, 502 So.2d 314 (Miss. 1986); Tutor v. Tutor, 494 So.2d 362 (Miss. 1986); Devereaux v. Devereaux, 493 So.2d 1310 (Miss. 1986).
Secondly, appellee argues that Miss. Code Ann. §§ 27-35-35 and 27-35-37 are unconstitutionally vague and ambiguous in that they fail to set forth a specific formula for valuation of branch bank intangibles. It has long been the policy of this Court to construe statutes in harmony with the Constitution where reasonably possible. Miss. Power Co. v. Goudy, 459 So.2d 257 (Miss. 1984); Rias v. Henderson, 342 So.2d 737 (Miss. 1977); Board of Education of Benton County v. State Educational Finance Comm'n, 243 Miss. 782, 138 So.2d 912 (1962); Wilmut Gas & Oil Co. v. Covington County, 221 Miss. 613, 71 So.2d 184 (1954). Any vagueness or ambiguity in §§ 27-35-35 and 27-35-37 when read in isolation is cured by reading them in pari materia with other statutes dealing with the same or similar subjects, especially § 27-13-13. See Allgood v. Bradford, 473 So.2d 402 (Miss. 1985); Miss. Public Service Comm'n v. Municipal Energy Agency of Mississippi, 463 So.2d 1056 (Miss. 1985).
Appellee additionally contends that § 27-35-35 is unconstitutional because it fails to allow deduction from taxable capital (i.e., net worth) those amounts invested in tax exempt government securities. The deductions from taxable capital authorized by § 27-35-35 are not general exemptions, but instead are items which would otherwise be taxable assets, e.g., real property, etc. Government obligations are expressly exempted from ad valorem taxation by § 27-31-1(u) (Supp. 1982). It would have been superfluous indeed for the text of each taxing statute to recapitulate the three pages of general exemptions set forth in § 27-31-1(u). Clearly that section is to be read in pari materia with all taxation statutes. Nothing in § 27-35-35 implies that the general exemptions of § 27-31-1 are inapplicable to banks. If appellee reported amounts invested in government securities as part of its taxable capital, it erred. We express no opinion as to whether appellee is entitled to a separate refund for overpayment of taxes based upon overvalued capital.
Thirdly and finally, appellee argues that in the event this Court affirms the decision of the trial court, it is entitled to a refund of the excess with interest. This Court has held that in the absence of a statute so providing, the State is not liable for interest on a refund for overpayment of taxes. Gulf M & O Railroad Co. v. Webster County, 194 Miss. 660, 13 So.2d 644 (1943). Appellee has cited no such applicable provision, and we have found none. We therefore conclude that appellee is entitled to no interest on its overpayment refund.
The cause is remanded to the Circuit Court of Calhoun County for determination of the amount, if any, disbursed from appellee's bad debt reserves to cover actual bad debts realized during the taxable year and, in accordance with that determination, for recomputation of appellee's tax liability under the State Tax Commission formula.
AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.
DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, GRIFFIN, and ZUCCARO, JJ., concur.
HAWKINS, P.J., and ANDERSON, J., not participating.

*153
 APPENDIX
 STATE TAX COMMISSION FORM 71-068
Form 71-068
5/81
Replaces 25000
DELIVER TO COUNTY AND CITY ASSESSORS NOT LATER THAN APRIL 1st.
 ASSESSMENT OF INTANGIBLES OF BANKS
NAME OF BANK: Grenada Bank, Including Branch Offices 
Located at Grenada in Grenada County, Mississippi.
 (If a National Bank, as agent of its shareholders)
 Number of Par Value Amount Issued
 Shares of Each and
 Outstanding 
A. CAPITAL STOCK
 1. Preferred ......... _______ $ _____ $ ___________
 2. Common ............ 670,298 $ 10,00 $ 6,702,980.00
B. SURPLUS:
 3. "Earned Surplus" (See Section
 81-3-11, Code 1972) ................... 35,897,020.00
 4. Other Surplus ......................... ____________
 5. Undivided Profits ..................... 4,111,977.08
 6. Surplus Reserve[*] .................. ____________
 7. Paid In Surplus ....................... ____________
C. OTHER ADDITIONS:
 8. (See Section 27-35-35, Code of 1972) .. ___________
 ___________
 ___________
D. NET WORTH OF STOCKHOLDERS: .............................. $ 46,711,977.08
E. DEDUCTIONS AUTHORIZED:
 9. "Earned Surplus" ..................... $35,897,020.00
 10. Paid-In Surplus[**] ............... ____________
 11. Preferred Stock Held by R.F.C. (See
 Section 81-3-11, Code of 1972) ...... ____________
 12. Other Deductions (See Section
 27-35-35, Code of 1972) ............. ____________
 13. Total Deductions Authorized, Excluding
 Real Estate .......................................... $ 35,897,020.00
F. NET VALUE FOR ASSESSMENT PURPOSES
 (to line A Form 71-069 .................................. $ 10,814,957.08
 14. Real Estate Assessed to Parent
 Bank-Book Value ..................... 2,555,699.21
 15. Value of Tangible Personal Property
 Assessed to Parent Bank-Book Value
 (See Section 27-35-35, Code of 1972)
 Form 71-005 classes 1, 2, 3, 4, 6 &
 7) .................................. 644,670.33
 16. Capital Assigned to Branch Banks (See
 Section 27-35-35, Code of 1972) (from
 Form 71-069 ......................... 7,260,082.00
 17. Authorized Deductions ............................... $ 10,460,451.54
G. NET ASSESSMENT OF INTANGIBLES (carry to Line 5 Form
 71-005 if greater than zero) ....................... $ 354,505.54
NOTE: The Tax Commission suggests that the Capital Assigned to Branch Banks
be determined by applying the ratio that Book Value of Real and Personal
Property Assessed to the Branch Bank bears to the Book Value of Real and
Personal Property owned by the bank and its branch banks, to Net Value for
Assessment Purposes computed above. Form 71-069 which has been designed for
this purpose should be filed along with Form 25002 with the assessor of the
county and municipality where the branch bank is located. Forms 25000, 25001
and 27000 should be filed by the parent bank with the county and municipal
assessor where the parent bank is located. Forms 25001, 25002 and 27000
should be filed by the branch bank(s) with the county and municipal assessor
where the branch bank(s) is located.

NOTES
[1] See discussion of Issue IV infra.
[2] Assessed capital, or "NET VALUE FOR ASSESSMENT PURPOSES" as it is labeled on Form 71-068, is the combined stated capital and undivided profits of the parent bank and all its branches. See Appendix to this opinion.
[3] The intangibles valuation was determined by the Tax Assessor to be $522,561 rather than $522,560 as reached in the discussion above. The Tax Assessor's $1.00 error is traceable to his failure to round off the nearest dollar the amount equivalent to Commission formula figure LBP.
[4] See Appendix to this opinion.
[5] See page 143.
[6] At the time of the assessment in question, § 112 provided:

Taxation shall be uniform and equal throughout the state. Property shall be taxed in proportion to its value. Property shall be assessed for taxes under general laws, and by uniform rules, and in proportion to its value. But the legislature may provide for a special mode of valuation and assessment for railroads, and railroad and other corporate property, or for particular species of property belonging to persons, corporations, or associations not situated wholey [sic] in one county. But all such property shall be assessed in proportion to its value, and no county, or other taxing authority, shall be denied the right to levy county and special taxes upon such assessment as in other cases of property situated and assessed in the county. But the legislature may provide aa special mode of assessment, fixing the taxable year, date of the tax lien, and method and date of assessing and collecting taxes on all motor vehicles.
Section 112 has subsequently been amended, but the substance of the former section as it relates to the case at bar remains unchanged.
[7] I.e., assessed according to the separate personal and real ratios.
[8] We note that this issue should not create any further controversy. Section 112 of the Mississippi Constitution was amended in 1986 (after judgment was entered in this case) to prescribe assessment ratios for various classes of property:

For purposes of assessment for ad valorem taxes, taxable property shall be divided into five (5) classes and shall be assessed at a percentage of its true value as follows:
Class I. Single-family, owner-occupied, residential real property, at ten percent (10%) of true value.
Class II. All other real property, except for real property included in Class I or IV, at fifteen percent (15%) of true value.
Class III. Personal property, except for motor vehicles and for personal property included in Class IV, at fifteen percent (15%) of true value.
Class IV. Public utility property, which is property owned or used by public service corporations required by general laws to be appraised and assessed by the state or the county, excluding railroad and airline property and motor vehicles, at thirty percent (30%) of true value.
Class V. Motor vehicles, at thirty percent (30%) of true value.
Under this scheme, intangibles of branch banks would be Class III property and would be assessed at 15% of true value.
[*] If the reserve for bad debts has been created under regulations of the Internal Revenue Service, it is not a surplus reserve and is not subject to Ad Valorem Tax. All other reserves are surplus reserves, and taxable, when otherwise created. However, any worthless assets carried on the balance sheet may be itemized in a separate schedule and deducted in "other deductions".
[**] Section 81-3-11, Code of 1972: Deductions not to exceed common stock, and deductible only if derived from sales of shares after January 1, 1961.